**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David BRUMMITT, Defendant-Appellant.**

**No. 81–1067.**

United States Court of Appeals, Fifth Circuit.

Dec. 28, 1981.

Rehearing Denied Feb. 8, 1982.

---

Charles L. Roberts, El Paso, Tex., for defendant-appellant.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, TATE and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

David Brummitt appeals from his conviction for criminal contempt for failure to testify before a federal grand jury after being granted use immunity under 18 U.S.C. §§ 6002, 6003. On appeal, Brummitt principally claims that (a) the testimony he refused to give would subject him to foreign prosecution, against which use immunity would not protect him, and that he was denied an opportunity to present evidence as to the real hazard of foreign prosecution that his testimony would present; (b) his five year sentence is excessive; and (c) the jury selection process in the district does not represent a cross-section of the community. For the reasons set forth below, we affirm Brummitt's conviction.

Brummitt's instant conviction arises out of his refusal to testify on September 18, 1979 and again on August 8, 1980, before a federal grand jury investigating the 1976 crash of a marijuana-loaded airplane in Marfa, Texas, just a few miles north of the Mexican border, on a flight originating in Mexico. Brummitt, under court subpoena, appeared before the grand jury on September 18, 1979, but refused to testify concerning the events of the marijuana purchase in Mexico and its American based financing, invoking his fifth amendment right against self-incrimination. Brummitt continued in his refusal to testify even after being given a grant of use immunity. He was held in civil contempt and served four months in civil confinement. The facts surrounding that adjudication are set out in prior proceedings that affirmed his civil contempt conviction. *In re Grand Jury Proceedings (Brummitt and Scarborough)*, 608 F.2d 640 (5th Cir. 1979), after remand, 613 F.2d 62 (5th Cir. 1980).

On August 8, 1980, after serving his civil contempt sentence, Brummitt was again summoned before the same federal grand jury, and again refused to answer the same questions concerning the events leading to the 1976 crash of the marijuana-loaded plane. At this time he was charged with criminal contempt under 18 U.S.C. § 401(3) [1]

1. Brummitt was charged in count one with refusal to testify on September 18, 1979 and in count two with refusal to testify on August 8, 1980. The government at no time suggested that multiple criminal punishment should be imposed for the two consecutive refusals to answer questions about the same transaction.

18 U.S.C. § 401(3) provides:

Section 401. POWER OF COURT

for his failure to testify on the two occasions. After a jury trial on the merits, Brummitt was convicted and sentenced to five years imprisonment on count one, with credit for time served in civil confinement.

## A. *Fifth Amendment Challenge*

Brummitt invoked his fifth amendment privilege and refused to answer, on two occasions, questions prepounded to him before the federal grand jury concerning the purchase of illegal drugs, and its financing, that preceded the 1976 plane crash. He continued in his refusal even after receiving a grant of use immunity. Brummitt claims on appeal that such testimony would subject him to possible prosecution in a foreign country (Mexico). The district court, having allowed the defendant to make an offer of proof[2] to the effect that Brummitt had an actual subjective fear of foreign prosecution, ruled that Brummitt's claims of a fear of Mexican prosecution were only conclusory and speculative. The proffer submitted by statement of counsel pointed out that Mexican criminal law, which permits in absentia prosecutions, imposes harsh criminal penalties and that Mexican courts would not be bound by a grant of immunity in the United States. It also suggested that the United States Attorney could, under Fed.R.Cr.P. 6(e)(3), lawfully leak information of the defendant's grand jury testimony to a federal enforcement agency (the Drug Enforcement Administration), which federal agency shares information with the Mexican drug enforcement agencies.

Aside from finding highly speculative the defendant's subjective fears of Mexican prosecution for the marijuana transaction of some five years ago, the district court primarily relied upon the court's power, in compelling testimony under a grant of immunity, to prohibit its disclosure for any other purpose than for American criminal prosecution.

Under Fed.R.Cr.P. 6(e)(3) (as last amended in 1979),[3] a federal attorney with criminal prosecutorial powers may ex parte obtain disclosure of grand jury testimony "for use in the performance of *such attorney's* duty," as may other "government personnel" as are deemed necessary by such attorney to assist him in the performance of "such attorney's duty to enforce the *federal* criminal law." The district court held that the rule permitting disclosure without court order to government attorneys (and those acting for them in aid of their federal criminal duties) did *not* authorize them to dis-

---

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

\* \* \* \* \* \*

(3) Disobedience or resistence to its lawful writ, process, order, rule, decree, or command.

2. The district court had offered to take testimony and set a time for a hearing, but (according to the district court's opinion) the defense counsel later indicated he would file a proffer.

3. As amended in 1979, Fed.R.Cr.P. 6(e)(3) relevantly provides:

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand jury; may be made to—
(i) an attorney for the government for use in the performance of such attorney's duty; and
(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce criminal law.

(B) Any person to whom matters are disclosed under subparagraph (A)(ii) of this paragraph shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law. An attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made.

\* \* \* \* \* \*

If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

As pointed out in the 1977 Advisory Committee report, "attorney for the government" is defined for purposes of the Federal Rules of Criminal Procedure, as the Attorney General, a United States Attorney, and their authorized assistants.

close the testimony they had obtained to any other prosecutorial authority without court authorization. In its oral comments explaining its rule, the court stated that those matters that are obtained before the grand jury on a grant of immunity could not be released except with the consent of the court, and that the court could not "put itself in the position of violating the grand jury's integrity by allowing that proof to be released once the person has been given immunity. The court would be under an obligation to seal what he said before the grand jury." R. IV, pp. 12–13.[4]

In the defendant's previous civil contempt case, reiterating the point that in this circuit *fear* of foreign prosecution is not a defense to contempt for refusal to testify, we stated:

> In our prior opinion, we relied on precedent to hold that the fear of foreign prosecution is not a defense to contempt for refusal to testify and "that a grand jury witness is adequately protected against the leak of his testimony by the district court's power to prevent such disclosure. *See* Fed.R.Crim.P. 6(e)." 608 F.2d at 643. *See In re Grand Jury Proceedings (Postal)*, 559 F.2d 234 (5th Cir. 1977) (per curiam), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1234, 55 L.Ed.2d 762 (1978); *In re Tierney*, 465 F.2d 806 (5th Cir. 1972), *cert. denied*, 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973). Even if we were to entertain such a defense in this circuit, *cf. In re Federal Grand Jury Witness (Lemieux)*, 597 F.2d 1166, 1168–69 (9th Cir. 1979) (Hufstedler, concurring specially), appellants' offer of proof has not presented a sufficient showing that they will be prosecuted by a foreign sovereign or that the protections of Rule 6(e) will be inadequate to prevent the disclosure of incriminating testimony. The trial court, therefore, committed no error in refusing to entertain appellant's defense.

*In re Brummitt*, 613 F.2d 62, 64 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980).

The defendant relies on *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972) for the proposition that the fifth amendment privilege should include a fear of foreign prosection. There the Court found there was no showing that the defendant was ever in real danger of being compelled to disclose information that might incriminate him under foreign law. *Id.* 406 U.S. at 479–81, 92 S.Ct. at 1675–76. The Fifth Circuit in *In re Tierney*, 465 F.2d 806, 811–12 (5th Cir. 1972), *cert. denied*, 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973), reached the identical result that was reached in *Zicarelli*, but for different reasons. The view of the Fifth Circuit was that due to the secrecy of the grand jury proceedings, no substantial risk of foreign prosecution was posed, citing Rule 6(e). The court decided that it would not rule on a speculative hypothesis that did not make out a substantial risk of foreign prosecution resulting from the compelled testimony.

While the Fifth Circuit has recognized that a different case might be presented where the appellant demonstrated that the content of his answers would be used as evidence against him in a foreign prosecution, *In re Grand Jury Proceedings (Field)*, 532 F.2d 404, 406 (5th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976), the defendant Brummitt has not made a showing on the record that he is in any real danger that his compelled testimony might be used in or give rise to a foreign prosecution. *In re Grand Jury Proceedings (Postal)*, 559 F.2d 234, 236–37 (5th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1234, 55 L.Ed.2d 762 (1978). Furthermore, under present circuit jurisprudence, "because of the secrecy of the grand jury proceedings no substantial risk of foreign prosecution is posed. Rule 6(e), Fed.R.

---

**4.** In its written order ruling on the motion, the court summarized this view thusly:

> To infer that this Court would on the one hand give defendant immunity, and on the other hand renig on its own integrity is so

difficult to assume it is speculative. Only the Court can give immunity; only the Court can order the witness to answer; only the Court can order disclosure.

Crim.P., provides for this secrecy." *In re Tierney, supra,* 465 F.2d at 811. *Cf., United States v. Malatesta,* 583 F.2d 748, 752–53 (5th Cir. 1978), *reh.* (on other grounds), 590 F.2d 1379 (5th Cir.), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

The defendant Brummitt contends, however, that the protection envisaged by these prior Fifth Circuit decisions—that the court that granted imunity could seal its use for the purposes of foreign prosecution—has been eroded by broadening amendments to Rule 6(e)(3) that permit government personnel, in addition to federal attorneys, to secure access to the grand jury testimony. However, as earlier noted (see text at footnote 3), disclosure to such personnel is limited to purposes of assisting the attorney to enforce federal (American) criminal law, and neither the attorney nor his assisting personnel may disclose this testimony to other law enforcement personnel without express court order. See *United States v. Malatesta, supra* 583 F.2d at 752–53. Insofar as the defendant relies upon the thoughtful concurring opinion of Judge Hufstedler in *In re Federal Grand Jury Witness (Lemieux),* 597 F.2d 1166, 1168 (9th Cir. 1979), we may simply say that the views there expressed are foreclosed to us by controlling precedent of this circuit.

■ Without citation of relevant authority, Brummitt also contends that he should have been permitted to make a factual showing of the reality of the threat to him of foreign prosecution that might result from his compelled testimony. As we understand the record, the district court afforded him an opportunity to do so before the court itself in a nonjury hearing, but Brummitt was content to rely upon his proffer—and, in the light of controlling circuit precedent, we find that this proffer was not sufficient to show more than a speculative and merely abstract fear of foreign prosecution. Brummitt contends that he should have been permitted to present before the jury the reality of his fear of foreign prosecution, as a defense to the

charged criminal contempt. However, the contempt was based on his failure to comply with a court order directing him to answer the questions and on the lawfulness of the court's order "involves a pure question of law whose determination is cognizable by the court and not the jury." *United States v. Bukowski,* 435 F.2d 1094, 1108 (7th Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971).

### B. *Excessive Sentence on Criminal Contempt Charge*

■ Brummitt also contends on appeal that his criminal sentence of five years is excessive. A sentence for criminal contempt (under 18 U.S.C. § 401) is properly reviewable on appeal, *United States v. Leyva,* 513 F.2d 774, 779 (5th Cir. 1975), where the trial court has abused its discretion, *Green v. United States,* 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672 (1958).

■ Brummitt's argument that his five year sentence should be reduced as excessive is grounded on prior circuit cases which required the reduction of a thirty-five year sentence, *United States v. Leyva, supra,* 513 F.2d 774, and a fifteen year sentence for criminal contempt, *United States v. Gomez,* 553 F.2d 958, 959 (5th Cir. 1975), to a two-year sentence.

In the instant case the defendant was sentenced to one five year term, with credit for the four months served for civil contempt. This sentence is much less severe initially than the sentences first imposed on the defendants in *Leyva* and *Gomez.* Considering the fact that the defendant would have been subject to five years imprisonment under 18 U.S.C. § 1510 for obstruction of a criminal investigation into narcotics violations (the effect of Brummitt's refusal to answer questions was to prevent the investigation and timely prosecution of the criminal financing in Texas of the marijuana importation) or subject to a five year sentence for perjury under 18 U.S.C. § 1621 (if he *had* testified, but falsely),[5] and in

---

5. In *Leyva, supra,* 513 F.2d at 780, a thirty-five year conviction for criminal contempt was re-

duced to two years, a formula arrived at by consulting the penalty for civil contempt (18

view of Brummitt's refusal to answer any questions concerning the marijuana transaction itself or his financial backing in the United States, we cannot say that this sentence is an abuse of the trial court's discretion. Accordingly, we affirm the criminal contempt sentence of five years less credit for time served on the *civil* contempt.

### C. *Jury Selection Process*

Additionally, Brummitt argues that the grand jury selection process in the El Paso Division of the Western District of Texas violates the requirements of both constitutional due process and of a statute (28 U.S.C. § 1861 et seq.) designed to assure random selection from a fair cross-section of the community. In his motion to dismiss the indictment,[6] Brummitt alleges that there is a significant underrepresentation of Hispanic surnamed individuals on the Master Jury List, due to their low representation in the voter registration list, which was the exclusive source of the jury list.

Brummitt introduced evidence, by affidavit and at the September 19, 1980 hearing on his motion to dismiss, that of the general population of El Paso County,[7] based on the 1970 census, 58.1% have Spanish or Hispanic surnames; that the district clerk obtains the Master Jury List (the names of prospective grand and petit jurors) exclusively from the voter registration lists; and that on the Master Jury List only 38.5% of those listed have Spanish or Hispanic surnames. Brummitt argues that this 19.6% disparity between the percentage of Hispanics in the total population and the percentage of Hispanics in the Master Jury List results from the fact that prospective jurors are chosen solely from the voter registration lists and

that Mexican-Americans traditionally register to vote in fewer numbers than do other recognizable groups.

### (a) *Constitutional Due Process Claim*

The requirements necessary to establish a constitutional claim of discrimination in the selection of a grand jury were set out in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). A defendant must show (1) that the group against whom discrimination is alleged "is one that is a recognizable, distinct class," (2) that the group is underrepresented on jury panels over a significant period of time, and (3) that the selection procedure is not racially neutral, or is susceptible of being used as a tool of discrimination. *Id.* 430 U.S. at 494, 97 S.Ct. at 1280. These prerequisites must be met before the defendant establishes a prima facie case, shifting the burden to the state to rebut the showing. Additionally, *Castaneda* requires the showing of some form of *intentional* discrimination. *Id.* 430 U.S. at 493, 97 S.Ct. at 1279. Neither a prima facie case nor the requisite intentional discrimination has been here established. As we recently stated, rejecting similar constitutional contentions:

> A prima facie case of discrimination cannot rest merely on statistics. The fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented on jury panels presents no constitutional issue. *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir. 1978).

*United States v. Lopez*, 588 F.2d 450, 452 (5th Cir.), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 319 (1979).[8]

---

months), the penalty for perjury (5 years), and the penalty for the overt obstruction of a criminal investigation into narcotics violations (5 years).

**6.** 28 U.S.C. § 1867(a):

In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indict-

ment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

**7.** El Paso County is co-extensive with the El Paso Division of the Western District of Texas.

**8.** *Lopez* involved a constitutional challenge to jury selection procedures in the Northern District of Texas that produced an underrepresentation of Mexican-Americans.

**(b)** *Statutory Discrimination Claim*

In addition to the claim of a denial of constitutional equal protection in the selection of grand jury panels, the defendant Brummitt also claims a discriminatory violation of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–74, timely raised by motion to dismiss the indictment, § 1867(a) (quoted in footnote 6). The statute declares its purpose is to recognize the right of litigants entitled to trial by jury "to grand and petit juries selected at random from a fair cross-section of the community," § 1861, and it prohibits exclusion of citizens from jury service "on account of race, color, religion, sex, national origin, or economic status." [9]

The Act authorizes the adoption of a jury plan based on the selection of potential jurors exclusively from the voter registration lists, 28 U.S.C. § 1863(b)(2). However, the statute itself provides that the plan shall

specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division. *The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title.*

28 U.S.C. § 1863(b)(2) (emphasis supplied).

■ The question presented is whether the plan used in the Western District of Texas fails to comply with the Act because it does not prescribe some other source of names in addition to the voter list,[10] alleged "necessary" to assure a fair cross-section since Hispanic Americans are significantly underrepresented on the voting registration lists.

■ The ground for attacking a plan is "a substantial failure to comply" with the provisions of the statute. 28 U.S.C. § 1867(d). Determining substantial compliance requires weighing the alleged violation against the goals of the Act. *United States v. Davis,* 546 F.2d 583, 589 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). Relying on *Davis,* the court in *United States v. Maskeny,* 609 F.2d 183 (5th Cir.), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980) recognized that

[t]he Court [in *Davis*] identified the major goal of the statute as the random selection of juries from a fair cross-section of the community; toward that end voter lists are to be the primary source of jurors' names and disqualifications, excuses, exemptions, and exclusions are to be based solely on objective criteria, *id.* The Court then held that one aspect of the selection process there under review constituted a technical violation of that statute but that the violation in no way affected the random nature of objectivity of the selection process and therefore did not constitute a substantial failure to comply with the statute.

609 F.2d at 191.

The deputy clerk for El Paso testified that the jury list was selected randomly, by

**9.** These statutory provisions in full provide:

§ 1861. Declaration of policy

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

§ 1862. Discrimination prohibited

No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status.

**10.** The district court noted that the defendant did not suggest supplemental lists. Possible suggestions might be lists of utility subscribers, motor vehicle registration lists, drivers license lists, etc. Congress, however, has left the determination, when necessary, to the judiciary. H.R.Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* (1968) U.S.Code Cong. & Ad.News 1792, 1794. *See also,* Kairys, Jury Representativeness: A Mandate for Multiple Source Lists, 65 Calif.L.Rev. 776 (1977).

computer, from one list of registered voters. Brummitt makes no contention here that this is not so. His sole complaint appears to be that the jury list shows a 19.6% underrepresentation of Hispanics because it is drawn exclusively from the list of registered voters, which in turn allegedly is not representative of the general Hispanic American population.

On the record before us, Brummitt attempted to establish that a greater proportion of Hispanic surnamed individuals do not register to vote than other segments of the population. The record is totally devoid of any other evidence or any statistical data presented by the defendant to establish his claim that this voter registration list itself represented a significant enough underrepresentation of Hispanics to cause the jury list to be illegally constituted.[11]

This court has held that failure of an identifiable group to register and vote does not render invalid the selection of jurors from a voter registration list.[12] We have also recognized that

> [o]nce a plaintiff establishes a prima facie case of jury discrimination which goes unrebutted, corrective action may be required. In considering the degree of corrective action required, "the court may exact from officials responsible for the construction of the jury list a high standard of comparability between demographic percentages and those of the jury list." *Berry v. Cooper*, 577 F.2d 322, 327 (5th Cir. 1978) (quoting *Broadway v. Culpepper*, 439 F.2d 1253, 1259 (5th Cir. 1971)). In exacting this high standard of comparability, a disparity which would be insufficient to prove substantial underrepresentation in the first instance may be sufficient to require additional corrective action *after an unrebutted prima fa-*

*cie case of jury discrimination has been established.*

*Newberry v. Willis*, 642 F.2d 890, 893 (5th Cir.), *reh. denied*, 650 F.2d 284 (5 Cir. 1981) (emphasis added). However, here, no prima facie case of jury discrimination has been established.

██ The thrust of the defendant's evidence establishes only that there is a disparity between the proportion of Hispanic Americans in the *gross* general population and the proportion of those selected on the master jury list (although the latter is roughly equal to the proportion of Hispanic Americans on the voting registration lists, from which potential juries are fairly and randomly selected). However, to establish the prima facie case of a denial of a fair cross-section, the disparity between the proportion of members of an identifiable class on a jury list must be based not on *total* population but, instead, on those of the identifiable class who are *eligible* to serve as jurors. Section 1861 only requires that a fair cross-section of the community include that they be fairly drawn from those eligible to serve on the jury. *United States v. Gordon-Nikkar*, 518 F.2d 972, 976 (5th Cir. 1975); *United States v. McVean*, 436 F.2d 1120, 1122 (5th Cir. 1971), *cert. denied*, 404 U.S. 822, 92 S.Ct. 45, 30 L.Ed.2d 50 (1971), *reh. denied*, 404 U.S. 952, 92 S.Ct. 277, 30 L.Ed.2d 269 (1971).

The evidence as to underrepresentation of Hispanic Americans on the voting registration lists rests on generalized and unspecific testimony that traditionally they tend to register in lesser numbers. The evidence does not attempt to demonstrate that the proportion of Hispanic Americans in the general population is similar to that of those eligible to serve as jurors.

---

11. In *U. S. v. Goff*, 509 F.2d 825 (5th Cir.), *cert. denied*, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975), for example, the percentages of blacks and food stamp recipients in the *entire population* was compared to the percentages of each category *registered to vote*.

12. *United States v. Lopez, supra*, 588 F.2d at 452; *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir. 1978), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 412 (1978); *United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976); *Camp v. United States*, 413 F.2d 419, 421 (5th Cir.), *cert. denied*, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969).

The Act itself provides eligibility requirements for jury service. 28 U.S.C. § 1865.[13] With regard to those requirements, the evidence before us does not, for instance, show the proportion of residents with Hispanic surnames who are citizens or who are able to speak and satisfactorily read and write English, to mention certain obvious juror-eligibility requirements that the numbers of Hispanic-surnamed individuals in an area adjacent to the Mexican border might not be expected to possess in similar proportion to other identifiable segments of the total population.[14]

On the record before us, Brummitt has failed to carry his burden of establishing a prima facie case of substantial non-compliance with the statutory provisions.

■ We, therefore, affirm the denial of Brummitt's motion to dismiss the indictment,[15] although we acknowledge that when such evidence is provided and a prima facie case of jury discrimination is established, supplementation of the voter list with "some other source or sources of names in addition to voter lists" is congressionally mandated. 28 U.S.C. § 1863(b)(2). While, as the district court states, no cases have been found in which a jury plan was found to violate the statute for failure to supplement a primary voter list,[16] the statutory requirement is clear that when it is established that the "policies" and "rights" secured by 28 U.S.C. §§ 1861, 1862 are not met by exclusive use of voter lists, it is encumbent on the officials responsible for constructing the jury list to provide additional sources.[17] *Cf. Newberry v. Willis, supra,* 642 F.2d at 893.

*Conclusion* :

For the reasons stated above we AFFIRM Brummitt's conviction and five year sentence for criminal contempt.

AFFIRMED.

---

**13.** 28 U.S.C. § 1865(b) provides:

> (b) In making such determination the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—
>
> (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
>
> (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
>
> (3) is unable to speak the English language;
>
> (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
>
> (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

**14.** We have previously noted, in discussing the magnitude of disparity needed to establish a prima facie case, that an important issue is presented as to whether general population statistics or more meaningful eligible population statistics should be used. Here, no facts were presented which would allow this court to consider any possible disparity or "implicit assumptions" presented by such statistics. "The inquiry is an important one—a given disparity may increase or decrease substantially depending on which set of statistics is employed." *U. S. ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1123 (5th Cir. 1981). *See also,* Gewin, An Analysis of Jury Selection Decisions, Appendix to *Foster v. Sparks,* 506 F.2d 805, 811 (5th Cir. 1975).

**15.** We thus affirm the district court decision. *United States v. Brummitt,* 503 F.Supp. 859 (W.D.Tex.1980).

**16.** *See United States v. Gaona,* 445 F.Supp. 1237, 1240 (W.D.Tex.1978) which cites cases listed in *Gewin, supra* n.12 for this proposition. *But see, Berry v. Cooper,* 577 F.2d 322 (5th Cir. 1978) (jury lists found to be discriminatory may be required to be revised).

**17.** *See* note 10, *supra.*