**UNITED STATES of America, Plaintiff,**

v.

**Martin BARTESCH, Defendant.**

**No. 86 C 2375.**

United States District Court,
N.D. Illinois, E.D.

Sept. 5, 1986.

Anton R. Valukas, U.S. Atty. by Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., Neal M. Sher, Michael Wolf, Joseph F. Lynch, Michael S. Bernstein, Joel Greenberg, Office of Special Investigations, Crim.Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

George B. Collins, Collins, Uscian & Bertelle, Chicago, Ill., for defendant.

**ORDER**

BUA, District Judge.

Before the Court is plaintiff's motion to compel defendant to answer deposition questions and allegations of the complaint. For the reasons stated herein, plaintiff's motion is granted.

## I. FACTS

The government filed this denaturalization action against the defendant, Martin Bartesch on April 7, 1986. The government alleges that the defendant misrepresented his activities during World War II when he applied for and obtained immigration to, and citizenship in, the United States. As an alternative ground for denaturalization, the government alleges that the defendant acquiesced and personally assisted in persecution and conduct contrary to civilization and human decency on behalf of Nazi Germany during wartime. The wartime activities occurred during defendant's service as a concentration camp guard in the *Totenkopf-Sturmbann* (Death's Head Battalion) at the Mauthausen concentration camp system in Austria.

During his deposition conducted on June 2 and 3, 1986, defendant, on advice of counsel, asserted a Fifth Amendment privilege and refused to answer questions concerning his whereabouts and activities between July 1, 1943 and August 25, 1945. In addition, he refused to answer questions regarding his efforts to immigrate and obtain United States citizenship. Defense counsel stated that the invocation of the Fifth Amendment was not based on the possibility of prosecution in the United States, but rather on the possibility of prosecution in West Germany, Austria, or Romania.

Relying on his Fifth Amendment privilege, defendant refused to answer questions such as: (1) whether (during the period between July 1, 1943 and August 25, 1945) he had ever been at Mauthausen or any concentration camp; (2) whether he belonged to a *Totenkopf-Sturmbann;* or (3) whether he performed military service. With respect to his immigration and naturalization, defendant refused to answer whether he intentionally had provided false information to United States officials and whether sworn immigration documents placing him in the SS combat division "Prinz Eugen" were correct. These questions are some examples of the questions which defendant refused to answer in his deposition.

Defendant did answer "no" to the following questions: (1) whether he had ever mistreated, shot, or killed a prisoner; (2) fired a weapon; (3) touched a prisoner; and (4) was ever present at a hanging. Defendant's answer to the complaint, filed on June 13, 1986, took a similar approach. In all, defendant invoked the Fifth Amendment in response to 21 paragraphs of the complaint (paragraphs 7, 9–11, 14–15, 18, 22, 36, 42, 48, 53, 55–58, 65, 70, 75–76, 79).

## II. DISCUSSION

■ Defendant asserts his Fifth Amendment privilege based on the fear of foreign prosecution. Recently, the Seventh Circuit Court of Appeals rejected the assertion of the Fifth Amendment privilege based on a fear of foreign prosecution. *United States v. Joudis, In Re The Contempt Petition Mecislovas Mikutaitis*, 800 F.2d 159 (7th Cir.1986). The Court finds *Mikutaitis* to be dispositive of the present case.

In *Mikutaitis*, the appellant had been deposed in another's denaturalization case in Florida. At his deposition, Mikutaitis had refused to answer any questions that went beyond his identity, asserting his rights under the Fifth Amendment, despite a grant of immunity pursuant to 18 U.S.C. § 6002. Mikutaitis, who is of Lithuanian descent, asserted his Fifth Amendment right against self-incrimination because of the fear that the government's Office of Special Investigations (OSI) would seek his denaturalization and eventual deportation for his wartime activities. He claimed that the information requested by the OSI, if obtained by Soviet authorities, could result in his prosecution should the United States successfully seek his deportation. These arguments are the same as those made by the defendant here.

In rejecting Mikutaitis' claim of Fifth Amendment privilege, the Seventh Circuit said:

As an initial matter the existence of the Fifth Amendment right asserted by Mikutaitis is questionable. In a recent decision involving the family of former Phil-

lippine president Ferdinand Marcos, the Fourth Circuit ruled that the protections of the right against self-incrimination did not extend to foreign prosecution. *United States v. (Under Seal)*, [794 F.2d 920] No. 86–5572, slip op. (4th Cir. June 23, 1986). The Supreme Court stayed the order of contempt pending review by the Court. In doing so Chief Justice Burger concluded that "there is a 'fair prospect' that a majority of this court will decide the issue in favor of the applicants [the Aranetas]. *Murphy v. Waterfront Commission*, 378 U.S. 52 [84 S.Ct. 1594, 12 L.Ed.2d 678] (1964), contains dictum which, carried to its logical conclusion, would support such an outcome." *Araneta v. United States*, 55 U.S.L.W. 3031 (U.S. July 29, 1986).

*Mikutaitis*, at 161.

The Seventh Circuit concluded that it need not reach the difficult issue outlined above because "Mikutaitis' real and substantial fear of Soviet prosecution did not survive the attempt by the district court in Florida to protect the deponent." *Id.* The Seventh Circuit followed the analysis in *Zicarelli v. New Jersey State Commission of Investigations*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), and opted, as many courts have in cases involving fear of foreign prosecution, to decide the Fifth Amendment privilege claim on the basis that no real and substantial danger of foreign prosecution exists. In *Zicarelli*, the Supreme Court stated: "It is well established that the privilege protects against real dangers, not remote speculative possibilities." 406 U.S. at 478, 92 S.Ct. at 1675. In evaluating whether a real and substantial danger exists, the court should

focus upon such questions as whether there is an existing or potential foreign prosecution of him; what foreign charges could be filed against him; whether prosecution of them would be initiated or furthered by his testimony; whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and whether there is a likelihood that his testimony given here would be disclosed to the foreign government.

*Mikutaitis*, At 161-62, citing *United States v. Flanagan*, 691 F.2d 116, 121 (2d Cir.1982). *See also In re Grand Jury Proceedings (Cherrier)*, 748 F.2d 100, 103 (2d Cir.1984); *In re Grand Jury Proceedings (Nigro)*, 705 F.2d 1224, 1227–28 (10th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

In the present case, as in *Mikutaitis*, the defendant does not face an existing prosecution in his country of origin. In addition, the defendant has not brought to this Court's attention any extradition treaty which the government has with West Germany, Austria, or Romania. Finally, defendant has provided no evidence that the OSI shares the information it obtains in denaturalization cases with West German, Austrian, or Romanian authorities. *Mikutaitis*, At 162.

The Seventh Circuit then recognized that, as here, the deponent's "sincere fear is that on the basis of his testimony he will be denaturalized and deported, and that his testimony will somehow become public—thus allowing the Soviets to use it in a war crimes prosecution." *Id.* The court noted that denaturalization and deportation are civil proceedings and therefore they cannot serve as the basis for an assertion of privilege. *Id.* Finally, the court refined the key issue in the case:

All of this boils down to the question of the likelihood that this information will be disseminated to the Soviet Union. This in turn isolates the only serious issue in this case: namely, whether the sealing order is adequate to protect Mikutaitis from Soviet acquisition of his testimony and thus override his Fifth Amendment claim.

The Seventh Circuit concluded that, under the facts in *Mikutaitis*, a court order sealing the deposition would be a sufficient safeguard of the deponent's Fifth Amendment rights (to the extent such rights exist). *Id.* at 163.

In the present case, as in *Mikutaitis*, the defendant has failed to establish any factu-

al basis for questioning the efficacy of the accommodation of his rights by this Court. Instead, the defendant relied on the blanket assertion that a sealing order could never protect the information from being disseminated and cited cases involving grand jury testimony. However, a sealing order is far more effective in the present case, which involves a deposition as opposed to grand jury testimony. *Mikutaitis*, At 162. Finally, defendant's real and substantial fear of foreign prosecution cannot be based on pure supposition concerning the ability of a foreign power to overcome a court order designed to prevent the foreign power from obtaining the information. *Id.* at 163.

Therefore, the Court will enter an order sealing defendant's deposition and answer to the complaint and protecting against the dissemination of any information learned from his deposition testimony and answer. Since this order adequately protects and accommodates defendant's asserted Fifth Amendment rights, the Court rejects his claim of privilege and orders him to testify at his deposition regarding his activities between July 1, 1943 and August 25, 1945, as well as his efforts to immigrate and obtain United States citizenship.

█ If the defendant does not obey this order to testify at his deposition, the Court will impose the following sanction against him: the Court will draw an adverse inference from defendant's failure to testify, based on a continued assertion of his Fifth Amendment privilege, and may use the adverse inference in defendant's denaturalization proceedings. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *National Acceptance Co. v. Balthalter*, 705 F.2d 924 (7th Cir.1983).

### III. CONCLUSION

For the reasons stated above, the government's motion to compel defendant to answer deposition questions and allegations of the complaint is granted. The Court enters an order sealing defendant's deposition and his answer to the complaint.

This order protects against the dissemination of any information learned from defendant's deposition testimony and answers by any parties, their counsel, and their employees and agents.

IT IS SO ORDERED.